UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION
_____

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                                  NO. 13-20203-MCL

DERRICK EDDINS,

    Defendant.
_____

MOTION FOR DOWNWARD DEPARTURE AND VARIANCE
_____

    Comes now, Derrick Eddins, by and through undersigned counsel does hereby file this Motion for Downward Departure from the Advisory Guideline Range and a Variance from the final sentencing range based on 18 U.S.C. Sec. 3553(a).  In support of said Motion, your Defendant would respectfully state the following:

    A court may impose a sentence outside the properly calculated sentencing guideline range through either a departure or a variance.  A "departure" is typically a change from the final sentencing range computed by examining the provisions of the Guidelines themselves. It is frequently triggered by a prosecution request to reward cooperation . . . or by other factors that take the case "outside the heartland" contemplated by the Sentencing Commission when it drafted the Guidelines for a typical offense.

1

A "variance," by contrast, occurs when a judge imposes a sentence above or below the otherwise properly calculated final sentencing range based on application of the other statutory factors in 18 U.S.C. § 3553(a).

In order to calculate the appropriate sentence, a sentencing court must follow the three-step process set forth by *Gall v. United States*.  552 U.S. 38 (2007) (the district court should begin all sentencing proceedings by correctly calculating the applicable guideline range, and that "to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark"). *See also USSG §1B1.1(a)-(c) (Application Instructions)*.  First, the court must properly determine the guideline range. *Id.*; 18 U.S.C. § 3553(a)(4).

Second, the court must determine whether to apply any of the guidelines' departure policy statements to adjust the guideline range. *Id.*; 18 U.S.C. § 3553(a)(5). *See also United States v. McBride*, 434 F.3d 470 (6th Cir. 2006) (guideline departures are still a relevant consideration for determining the appropriate guideline sentence).

Third, the court must consider all the factors set forth in 18 U.S.C. § 3553(a) as a whole, including whether a variance—a sentence outside the advisory guideline system—is warranted.  *See* §1B1.1(c); *See also United*

2

*States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005); *United States v. Stone*, 432 F.3d 651, 655 (6th Cir. 2005); *United States v. Talley,* 431 F.3d 784, 786 (11th Cir. 2005).

The district court must consider, all reasons why a guideline sentence "fails to properly reflect Section 3553(a) considerations," "that the Guidelines reflect an unsound judgment, or, for example they do not generally treat certain defendant characteristics in the proper way. *Rita v. United States,* 127 S. Ct. 2456 (2007).  The district court cannot presume that the Guideline range applies to any particular case. *Nelson v. United States*, 129 S. Ct. 890, 892 (2009); *United States v. Gall*, 128 S. Ct. at 596-597; *Rita*, 127 S. Ct. at 2465.

## RELEVANT FACTS FOR ANALYSIS

Mr. Eddins is 25 years old and a native of Memphis, Tennessee.  He was raised by his mother who worked full-time to provide for her family.  His father, Danny Wilborn, was not significantly involved in his upbringing.  Mr. Wilborn was a drug addict.   Mr. Eddins is the youngest of three children.  He was raised with the assistance of his two older siblings, his brother, Lorenzo Eddins (age 35) and his sister, Arshelia Eddins (age 37).  Mr. Eddins upbringing was rough.  He grew up in a difficult neighborhood and struggled with school.  Mr. Eddins was exposed to drugs through his

3

older cousins at a young age and began using drugs at that time.

Mr. Eddins has never been married and he has no children. He has been in a romantic relationship with his co-defendant, Krystal Perry for four or five years. Both of his siblings and mother worked outside of the house and were not usually present during the day. His brother, Lorenzo is employed as an over-the-road trucker and his work kept him away from the family home for several days at a time. His sister, Arshelia works as a dental assistant and would be away from the home most every week day. Mr. Eddins' mother, Marry Eddins works for Millstone Medical in the warehouse. She has always maintained employment and would usually not be home during most week days.

Mr. Eddins had significant difficulty with school. Ms. Eddins reported that Derrick just did not seem to get it. Mr. Eddins had to repeat the ninth grade until Ms. Eddins actually removed Derrick from school. Derrick was frustrated and discouraged that he had difficulty learning. Ms. Eddins stated that Derrick felt he was "cursed" and was unable to fix his learning issues. Ms. Eddins stated that her son would become very emotional because he thought something was wrong with him.

Derrick witnessed episodes of domestic abuse as a small child in the home. His father assaulted his mother on multiple occasions which would

result in Derrick getting angry at his father for striking his mother.  In spite of the violence, Derrick yearned for a relationship with his father.  He resented the fact that is father was incarcerated and not a part of his life.  Additionally, as a small child, Derrick witnessed his mother being robbed at gunpoint.  Ms. Eddins believes that the violence and the absence of his father had a lasting impact on him.

Derrick comes from a loving family that "stays together and prays together."  Derrick grew up going to church and Sunday school.  Derrick's grandmother, Maxine King, taught Sunday school at the church.  Ms. Eddins stated that she used to assist Derrick in reading the Bible and he has continued to read the Bible, with the assistance of others, since his incarceration.

Ms. Eddins described her son as a good person, a very giving person, who is sensitive and non-violent.  She stated that he used to voluntarily cut the grass of others in his neighborhood without asking for payment.  Ms. Eddins firmly believes that Derrick was influenced by others to commit the instant offense and his realizing that his conduct was wrong, did not fully appreciate the magnitude of his conduct.  Ms. Eddins believes that Derrick would benefit from counseling.  She thinks counseling could help him appreciate his self-worth.  She also stated that she hopes Derrick learns a

5

trade while in prison.  Finally, once Derrick is released, he will have a strong family unit to help him along the way to complete rehabilitation.

 Mr. Eddins' physical condition is relatively unremarkable, except for a recent stabbing during an attempted robbery.  Derrick received a laceration to the optical area on the scalp and to the right cheek and forearm.

 Contrarily, Derrick's Mental and Emotional Health is much more enlightening.  Derrick has reported a history of depression along with admission for treatment to Memphis Mental Health Institute approximately four (4) years ago.  The admission was based in part on Derrick's attempt to commit suicide.  Derrick was originally examine by Dr. John Hudson in this matter.  Dr. Hudson testified at a competency hearing which ultimately lead to Mr. Eddins being referred to FDC-Miami for a Court ordered Psychological Evaluation.  Subsequently, Mr. Eddins was examined by the staff at FDC-Miami from October 2013 to November 2013.  Dr. Hudson will be present and testify regarding Derrick's emotional and intellectual issues in much greater detail o at the hearing.

 Derrick reported marijuana use began at the early age of nine (9) years old.  He soon thereafter became addicted to the drug and required almost daily usage.  Derrick experimented with other drugs at a very young age as well.  He first tried Xanax at age 11 or 12 and began abusing the narcotic

6

almost immediately. His Xanax usage continued up until his arrest on this matter. Derrick has drank alcohol since age 17 and has only experimented with cocaine. Derrick was treated for substance abuse a few years ago, however, he did not complete the program. Derrick would welcome receiving drug treatment and if eligible would like to participate in the intensive drug treatment program while incarcerated. Derrick also reported a history of hydrocodone and ecstasy use in the past.

   Derrick struggled with his education. He completed the eighth grade and was last enrolled at Kirby High School before being pulled out of school by his mother. Derrick was classified as "Learning Disabled" in 2004 by the Memphis City School Division of Exceptional Children and reported he received special education for all classes. Derrick struggled with reading and writing while in school. During 2004, a Psycho-educational Evaluation was conducted through the Memphis City Schools' Division of Exceptional Children. The report determined that Derrick's general cognitive ability was within the Extremely Low range of intellectual functioning with a full-scale IQ of 68. There were noted cognitive processing deficits in verbal comprehension which is associated with deficits in reading comprehension, mathematics reasoning, and written expression. Based upon the report, Derrick was required to repeat the third grade and was in the process of

repeating the sixth grade at the time of the evaluation.  It appears that Derrick would have been 14 or 15 years old when the evaluation took place.  This would have placed him several years older than the average age child in the Sixth grade.

During August 2005 and May 2006, records form Individualized Education Programs provided by the Memphis City Schools Division of Exceptional Children reflected that Derrick was performing four grades below his current grade level in math and six grades below his current grade level in reading and language arts.  Derrick was receiving at that time ten (10) hours of special education programs and twenty-three point seven five (23.75) hours of regular education per week.  It was noted in the report that Ms. Eddins remained concerned with Derrick's reading and reading comprehension.  It should be noted that nothing in these reports indicated any malingering or other intentional conduct to undermine the test results.

Throughout the PSR and the educational records, there is reference to Derrick's proficiency using his hands on projects and activities.  Derrick is interested in receiving training in auto mechanics.

**I.     DEPARTURES**

Departures provide authorized adjustments to a sentencing range within the guideline system. As Congress acknowledged in the Sentencing Reform Act, and the *Guidelines Manual* itself explicitly states, "it is difficult to prescribe a single set of guidelines that encompasses the broad range of human conduct potentially relevant to a sentencing decision." *Ch. 1 Pt. A(1)(4)(b); §5K2.0 comment. (backg'd); 18 U.S.C. § 3553(b)*.  Departures, therefore, perform "an integral function in the sentencing guideline system." *§5K2.0 comment. (backg'd)*.  Departures help provide courts with a way to impose an appropriate sentence in exceptional circumstances. They also maintain the statutorily mandated "flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." *Id.*; *28 U.S.C. § 991(b)(1)(B)*.

   **§5K2.0. Grounds for Departure (Policy Statement)**

§5K2.0 (b) DOWNWARD DEPARTURES IN CHILD CRIMES AND SEXUAL OFFENSES – sets out when and how the sentencing court may impose a sentence below the range established by the applicable guideline only if the court finds that there exists a mitigating circumstance of a kind or to a degree that –

   (1) Has been affirmatively and specifically identified as a permissible ground of
      downward  departures in the sentencing guidelines or policy statements under

    section 994(a) of title 28, United States Code, taking account of any amendments to such sentencing guidelines or policy statements by act of Congress;

(2) Has not adequately been taken into consideration by the Sentencing Commission I formulating the guidelines; and

(3) Should result in a sentence different from that described.

As such, the grounds enumerated in Park K of Chapter five are the sole grounds that have been affirmatively and specifically identified as a permanent ground for downward departures in the sentencing guidelines and policy statements. *Id*.

    As grounds for departure pursuant to U.S.S.G. Sec. 5K2.0, your defendant would submit the following:

1. §5K2.10 – Victim's Conduct (Policy Statement).  If the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstances of the offense.  The *Sixth Circuit* had held that Sec. 5K2.0.10 is limited to situations where "the victim's wrongful conduct contributed significantly to provoking the offense behavior." *US v. Corrado*, 304 F.3d 593 (6th Cir. 2002).  As set forth above and in prior pleadings, L.W. was actively engulfed in a life of prostitution, long before ever meeting Mr. Eddins.  She by her own admission, had run away from home and worked for a number of different pimps in a number of different states.  She was an admitted runaway prior to meeting Mr. Eddins, and there is no credible proof that Mr. Eddins caused her to do anything she was already not predisposed to do sexually prior

to their meeting. The basis for this departure is more fully set forth in other sentencing related pleadings including but not limited to the Position Paper, Memorandum and Motion to Strike and are incorporated by reference.

2. §5K2.13 – Diminished Capacity (Policy Statement) – a downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. It is undisputed that Mr. Eddins IQ is extremely low and he has always struggled with learning disabilities. Dr. John Hudson has previously meet with and evaluated Mr. Eddins and will be present to testify at sentencing as to this factor. If the Court determines that it is unable to consider this factor as a departure, the Defendant would object to the guidelines exclusion of this factor from the Court's consideration at sentencing as a violation of his due process rights. This factor can and should be considered as an appropriate variance. See below. Mr. Eddins would also submit that this factor can be considered pursuant to 5K2.22 – Specific Offender Characteristics in Child Crimes and Sexual Offense.

## II. VARIANCE

According to *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing Guidelines are advisory. The remedial majority in *Booker* held that the district courts must still consider the guideline range, *18 U.S.C. §3553(a)(4) and (5)*, as well as the directives set forth in *18 U.S.C. §3553(a). Id.* More recent Supreme Court cases like *Rita* and *Gall* have only emphasized that the Sentencing Guidelines are to be considered

advisory by the district courts. The facts and circumstances of Mr. Eddins' case provide a perfect example of where a Court ought to exercise its discretion, if not by imposing downward departures, by imposing a significant downward variance.

*Section 3553(a)* directs courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." *Section 3553(a)(2)* states that such purposes are:

(A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) To afford adequate deterrence to criminal conduct;

(C) To protect the public from further crimes of the defendant; and

(D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

*18 U.S.C. § 3553(a)(2) (A)-(D)*. The Court must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the kind of sentences available." And the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." *18 U.S.C. Sec. 3553 (a) (1), (3), (6)*.

### A. A below-guideline sentence is the appropriate sentence for Mr., Eddins

The PSR's conclusion that the appropriate guideline range for the conduct set forth in the report is in error. Mr. Eddins requests a below-guideline sentence based upon the following grounds. First, the Supreme Court, in *Gall v. United States*, pronounced, in no uncertain terms, that district courts may sentence defendants to significantly less time in prison than the guidelines suggest, and that district courts may do so for no other reason

than the courts' disagreement with the Sentencing Commission's policy pronouncements. This Court should disagree with the Commission's decision to recommend a base offense level identical to that of a conviction for a violation of *18 U.S.C. 1591(a)* when Congresses expressed desire was to treat these two types of convictions completely different.  Mr. Eddins has previously presented argument for a **base offense level of 24** and would make that same argument here by incorporated that argument by reference.

 Second, the guideline sentencing range set out in the PSR is significantly higher than the range provided the co-defendant, Krystal Perry, even though, the facts indicate, Ms. Perry played an equal role in the offense as Mr. Eddins.  While Mr. Eddins recognizes that Ms. Perry received the benefit of a 5K1.0 motion by the government, her cooperation was minor and limited to information, quite frankly already in the hands of the government through the admissions of Mr. Eddins.  As a matter of fact, Ms. Perry's statement to the Court in her position paper are actually supportive of a number of Mr. Eddins objections and in direct contradiction to the statements of L.W.  The Court should take into consideration the sentence received by Ms. Perry when determining an appropriate sentence.

 Third, Mr. Eddins intellectual capacity is a factor this court should consider in determining the appropriate sentence.  Mr. Eddins had a historical IQ of 68 and is functionally illiterate.  He has seen and been treated by psychiatrists and psychologists in the past for a number of different mental health conditions.  He struggled extensively throughout his childhood education.  He failed multiple grades and was in special education classes throughout his years in school.  His school records indicated that Mr. Eddins "appeared to put forth good effort" but was nonetheless classified as "Learning

Disabled" in 2004. Dr. John Hudson will be present at the sentencing hearing to provide more detailed testimony regarding Mr. Eddins mental and emotional health. His testimony along with the arguments set forth herein and previously placed before the Court in other sentencing related pleadings should be considered as proper grounds for a variance in this matter.

Fourth, Mr. Eddins not only admitted his guilt in a timely manner, but he has also sat down with the Agents for the United States and attempted to provide substantial assistance regarding his knowledge of an individual of interest to the United States in this and other sex trafficking offenses, Flocka, Camelle Sample. It is unclear if the United States will be making a motion on behalf of Mr. Eddins pursuant to 5K1.0. If the motion is not made, the Court can still consider Mr. Eddins acceptance of responsibility and attempted cooperation as a basis for a variance in this matter.

Fifth, Mr. Eddins would submit that this Court should take into consideration the conduct of L.W. in this matter. It is undisputed that L.W. was actively participating in prostitution prior to ever meeting the defendants. By her own admission, she had been prostituting out of four (4) states for three (3) different pimps in Memphis, Texas, or Miami prior to ever meeting Mr. Eddins. In addition, the time that Mr. Eddins and L.W. were actually together is very limited. Based upon the undisputed facts in the case, L.W. was only with the defendants for a couple of days in April. Interestingly and importantly, during those couple of days, L.W.'s text messages paint a clear picture that she was not only continuing to manipulate other pimps for support and business, but also independently soliciting a significant number of "johns" for sex completely unrelated to her relationship with the defendants. Finally, L.W.'s statements set out in the PSR lack

any sufficient indicia of reliability to be considered by the Court. They are not supported by the physical evidence (text messages), they are self-serving, they are inconsistent with facts that are known and clear in her text messages, and portray a picture that is not supported by any other credible evidence. The Court's reliance on these statements has been previously raised and incorporated by reference herein. *See Motion to Strike and Position Paper and Memorandum of Law*. At a minimum, L.W.'s conduct and motivation to not be truthful during multiple interviews with law enforcement should cause this Court to pause and reflect on their effect on the guideline range. Based upon her own voluntary conduct and the issues surrounding the credibility of the statements, this Court should grant a variance in order to address the inequities associated with L.W.'s role, credibility and motive to tell the truth. The fact that L.W. is a minor should not provide her a shield or ultimate protection from cross examination and critical review before the Court relies upon her prior untested statements. If the Court elects to consider those statements, without sufficient indicia of reliability, the Court should grant a substantial variance to take into account those constitutional infirmities and the likelihood that her statements are exaggerated, self-serving and unsupported by any other physical evidence.

    Sixth, while Mr. Eddins does not dispute his guilt, the Court should consider this conduct in relation to the original intent of Congress in enacting the statutes. *18 U.S.C. Sec. 1591* was inspired by the heart-wrenching stories of children forced into prostitution daily both abroad and in the United States. *See Trafficking Victims Protection Act of 2000, Pul. L. No. 106-386, 114 Stat. 1564*. The purpose of the *TVPRA* is "to enhance effective punishment of traffickers." *Trafficking Victims Protections Act of 2000, Pub. L.*

*No. 106-386, Sec. 102(a), 114 Stat. 1464, 1466 (codified at 22 U.S.C. Sec. 7101(a)).* The statutes were enacted in significant part to combat the millions of children in the United States and around the world, who are taken from their homes each year and forced into the commercial sex trade, which is akin to modern day slavery. The traditional factors associated with the statute and Congressional intent are not present in this case. As set out above, L.W. was actively participating in prostitution at an extensive level prior to ever meeting the defendants. It cannot be argued that she was forced to do anything that she was not already predisposed to do. Next, based upon her own text messages, L.W. was in contact with the defendants for only a couple of days and was always free to come and go. Her text messages show her traveling throughout the city and contacting numerous "johns" and "pimps" independently soliciting sex for money that was totally unrelated from the defendants. Third, based upon the testimony of Ms. Perry and the text messages of L.W., cocaine played an integral role in L.W.'s life both before and after her contact with the defendants. As a matter of undisputed fact, Ms. Perry stated in her position paper that the parties relationship terminated based exclusively upon L.W.'s insistence to continue cocaine usage. Almost immediately after their split, L.W. utilizes her source, Chris, for cocaine which is documented throughout the text messages. On a number of different occasions, L.W. and Chris discuss her desire and need for cocaine and together facilitate L.W.'s drug use. All of these factors paint a completely different picture than those of slavery, trafficking and violence which lead to the enactment of the statute. This Court should consider this when ultimately determining the appropriate sentence in this matter.

      Finally, let it be clear that the defendant realizes his conduct is wrong and he should

and will be punished. Mr. Eddins realizes and fully accepts that he will receive a significant jail sentence. Such a significant jail sentence will adequately address the mandatory factors in *18 U.S.C. Sec. 3553*. However, a jail sentence near the guideline range as set forth in the PSR is significantly greater than necessary to accomplish those goals. Once the Court has ruled upon all of the objections and considered the merits of not only the downward departures but also the grounds for a variance set forth herein and further articulated at the sentencing hearing, Mr. Eddins would submit that an appropriate sentence under all circumstances should be **no more than 120 months**.

WHEREFORE PREMISES CONSIDERED, the Defendant would respectfully request that this Honorable Court sentence the defendant consistent with the objections and arguments set forth above and in other pleadings currently before the Court.

Respectfully submitted,

***/s/ Howard B. Manis***
Howard B. Manis
1000 Ridgeway Loop, Suite 320
Memphis, TN 38120
(901) 682-0069
manislawfirm@comcast.net
Attorney for Defendant

CERTIFICATE OF SERVICE

      The undersigned hereby certifies that a copy of the foregoing Motion has been served on the following party via electronic mail, this the 20th day of November, 2014.

    Larry Laurenzi
    Assistant U.S. Attorney
    167 North Main, Suite 800
    Federal Building
    Memphis, TN 38103

                              ***/s/ Howard B. Manis***
                              Howard B. Manis